Dawn M. GREEN, Plaintiff-Appellant,

v.

NLT COMPUTER SERVICES CORPORATION, Defendant-Respondent.

No. WD 33258.

Missouri Court of Appeals,
Western District.

Feb. 8, 1983.

As Modified March 29, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied April 20, 1983.

Application to Transfer Denied May 31, 1983.

John Pat Burnett, Quinn, Peebles, Beaird & Cardarella, Howard Eisberg, Wells, Eisberg, Slough & Connealy, Kansas City, for plaintiff-appellant.

David M. Harding, Robert M. Beachy, Guy A. Magruder, Jr., Van Osdol, Magruder, Erickson & Redmond, Kansas City, for defendant-respondent.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

TURNAGE, Judge.

Dawn Green filed suit against NLT Computer Services Corporation, claiming that they had failed to give her a service letter correctly stating the length of her employment, the nature and character of her service, and the true cause of her termination. The jury returned a verdict for Green, assessing actual damages at $5,000 and punitive damages at $65,000. The trial court sustained a motion for judgment notwithstanding the verdict, and entered judgment in favor of NLT. In the contingency that the judgment N.O.V. was reversed on appeal, the trial court granted NLT a new trial on the ground that the verdict was against the weight of the evidence.

On this appeal, Green contends that the evidence was sufficient to support a verdict for at least nominal damages and punitive damages, and that the trial court abused its discretion in awarding a new trial on the ground that the verdict was against the weight of evidence. Reversed and remanded.

Green was first employed by NLT in August of 1977 as a computer operator. Later, she was designated as lead computer operator, and received an accompanying salary increase. Her duties as lead computer operator consisted of supervising the other computer operators when the regular supervisor was not present. Green's immediate supervisor was Jerry McNeal. McNeal's supervisor was Larry Sanders, who held the position of operations manager.

At the time of Green's employment with NLT, the company performed computer services for a number of banks and other businesses. The computer operations were performed in a large room using two computers, an IBM 360 "65," and an IBM 360 "50." The "50" computer was an older and slower running model than the "65" computer, and the person assigned to operate the "50" could work at a relatively leisurely pace due to the periods of inactivity experienced while waiting for the computer. Because the "65" computer was such a faster operating model, it required constant attention, and two operators were assigned to it. Green, Maureen Krumins, and Kerry Landenbaum had worked out an agreement among themselves to rotate between the "50" and "65," so they could share the lighter duties connected with the "50." In November of 1978, Green and Krumins were operating the "65" computer, and Landenbaum was operating the "50."

Green testified that on November 9, 1978, near the end of her shift at about 4:00 p.m., she overheard McNeal tell Sanders that he

was sick and tired of Green and Krumins not doing anything but sitting around and complaining about Landenbaum running the "50." Green said that this statement was made in the large computer room in the presence of a number of people, including NLT employees, representatives of client banks, and computer repairers. Green stated that she had walked over to McNeal and Sanders and told them that McNeal's statement was untrue, that she and Krumins had worked hard for them, and that she did not appreciate McNeal's making such a statement in the presence of all the people who had been in the room.

Green then told McNeal that she wanted Krumins to hear the statement, and Green promptly paged Krumins over the intercom system. When Krumins arrived, Green asked McNeal to repeat the statement, and when he refused, Green repeated the statement herself. Green testified that at that point McNeal told both Green and Krumins to "get the f____ out of here." Green asked McNeal why she was being told to leave, and she stated that McNeal responded by hollering and screaming for them to get out. Green said that she then asked McNeal if he was firing her, and he responded in the affirmative. According to Green, Sanders had been standing next to McNeal during the chain of events, and had been laughing throughout. When McNeal told her that she was fired, Green stated that she had turned to Sanders for verification, and that Sanders had backed McNeal up by telling Green to leave the premises. Green stated that she left immediately thereafter.

Landenbaum testified that there had been twenty-five to thirty people in the room when he heard McNeal tell Green that she was fired. He stated that he had seen no physical contact between McNeal and Green, but that during the course of the exchange, both McNeal and Green had turned to Sanders, who nodded his head. Landenbaum further testified that during the preceding summer, McNeal had picked up Green and dropped her on the floor so that she landed on her side. He said that this episode had left Green winded to the extent that she had been unable to move or say anything for a few minutes until she caught her breath.

Krumins' testimony corroborated that of Green and Landenbaum, in that she stated that she had not seen Green punch McNeal. Krumins added that she had observed McNeal jab his finger at Green and Green attempt to fend him off.

McNeal testified that he had been talking with Sanders on the day in question, when Green approached them and asked if they were talking about her. He agreed that Green paged Krumins over the intercom, and that he later told Green to leave the room. He stated that Green had asked him several times if she was fired, and that he had repeatedly told her that she was not. He said that at that point Green put her hands on his chest and shoved him backward, causing him to fall against a table. After this Green again inquired if she had been fired. McNeal stated that at that point he looked at Sanders, and when Sanders nodded his head, McNeal told Green she was fired.

Sanders testified that he had been the operations manager of the shift on which Green and the others worked, and that he was McNeal's supervisor. Sanders confirmed that the dispute had begun basically as the other parties had described. Sanders further corroborated McNeal's testimony that Green had asked him several times if she was fired, and that after Green had pushed McNeal, McNeal looked at Sanders who had nodded, prompting McNeal to tell Green that she was fired.

The deposition of Gene Bowlin, a computer operator who had worked on the same shift as Green, was read at the trial. Bowen stated that all he had heard were Green's words, "fire me, fire me, fire me." He stated Green had pushed McNeal and Bowlin described the push as "an antagonizing tap." At that point, he heard McNeal tell Green that she was fired.

Green returned to NLT on the next day, November 10, and spoke with Sanders. She stated that Sanders had apologized to her,

claiming that he had not realized the seriousness of the matter, and had expected her to return to work the next day. Sanders then wrote a "To Whom it May Concern" letter in his own handwriting, and gave it to Green during the November 10 meeting. The letter stated that Green had been employed by NLT as a computer operator, and most recently as a lead computer operator. The letter stated that "Dawn [Green] is an excellent computer [sic] and is able to perform all facets of computer operations." The letter continued that "due to an unfortunate incident she is no longer with us" and concluded that Green had always been "rated well above average."

During that same meeting, Green made a written request to Sanders for a service letter. On November 14, 1978, Sanders wrote such a letter, stating that Green had been employed from 8–10–77 through 9–9–78 by NLT as a computer operator. In the service letter Sanders rated Green as an above average computer operator, and stated that "[t]he reason for your termination was insubordination toward your immediate supervisor."

After the jury's verdict for Green, the trial court sustained a motion for judgment N.O.V., holding that there was no substantial evidence to support an award of actual damages, nor was there any substantial evidence upon which the jury could find that the letter did not correctly state the length of Green's employment, or the true cause of her termination. The court further found that there was no substantial evidence to support an award of punitive damages.

█ NLT concedes that the service letter incorrectly stated the date of Green's employment in that it gave her termination date as September 9, 1978, rather than November 9, 1978. Section 290.140 RSMo 1978 requires that whenever an employee of a corporation is discharged or voluntarily quits the service of the corporation, the employee's manager shall issue the employee a required service letter, setting forth the nature and character of service rendered by the employee, the duration thereof, and the true cause, if any, which led the

employee to quit such service to the corporation. An employee meeting the statutory qualifications "has a cause of action if the corporation fails to issue the letter or issues a letter not conforming to all the statutory requirements." *Labrier v. Anheuser Ford, Inc.*, 621 S.W.2d 51, 56[8] (Mo. banc 1981). Because NLT has conceded that the letter did not correctly state the duration of Greens' employment, Green made a case on NLT's failure to satisfy the statute's requirement that the letter correctly state the duration of the employment.

█ Green further contends that the service letter failed to correctly describe the nature and character of her service, in that it stated that she was a computer operator rather than a lead computer operator. Green points out that she was properly described as a lead computer operator in Sanders' handwritten letter of November 10. NLT does not deny that Green had the responsibilities of a lead computer operator, but rather claims that the title of computer operator was an accurate and adequate description of her position. Based on the evidence presented in this case, there was sufficient evidence from which the jury could have found that the letter did not correctly describe the nature and character of Green's service to NLT.

The principle disagreement between the parties is whether or not the letter stated the true cause of Green's termination. NLT contends that the evidence shows that Green was insubordinate, and points especially to a response made by Green on cross-examination in which she stated that she may have been insubordinate to a certain extent. However, in testing the sufficiency of the evidence to make a submissible case, "the evidence favorable to the plaintiff must be accepted as true and the defendant's evidence disregarded except where defendant's evidence aids the plaintiff's case." *Franklin v. Farmers Mutual Insurance Company*, 627 S.W.2d 110, 113–14[5] (Mo. App.1982).

Viewing the evidence in that light, the jury could have believed that Sanders did not take the incident seriously based on the

testimony that he had been laughing during the entire episode. This, coupled with Green's statement that Sanders told her the following day that he had expected her back at work and had not realized the seriousness of the incident, readily supports an inference that Sanders did not consider the incident of sufficient importance to constitute insubordination justifying Green's firing. This inference is further supported by the fact that the letter which Sanders wrote on the day after the incident and four days before he wrote the service letter did not state that Green's dismissal was due to insubordinate conduct on her part.

Green was not required to prove the true cause of her dismissal, but needed only to prove that the reason given by NLT in the service letter was not the true cause. *Labrier,* 621 S.W.2d at 57[10]. Green's testimony that she may have been insubordinate does not alter the result reached above, since the reason for her termination existed only in the minds of Sanders and McNeal. The evidence described above supports a finding that Sanders did not consider Green's conduct to have been insubordinate, at least to the extent of meriting her discharge. Thus, the evidence could have allowed a jury to infer that the insubordination referred to in the letter was not the true reason for Green's termination.

NLT responds that even if the letter did not state the true reason for her termination, the actual duration of her employment, or an accurate description of the nature and character of her service, Green failed to prove the elements of actual damages necessary to recover in a case of this type. *Labrier,* 621 S.W.2d at 57[11]. Green concedes that she did not prove actual damages, but contends that she was nevertheless entitled to nominal damages. In *Labrier* the court held that even though the elements of actual damages had not been proven, the plaintiff was entitled to nominal damages of $1.00. This court adopts that holding in this case. Having proved

deficiencies in the service letter, Green was entitled to nominal damages of $1.00 in the absence of proof of actual damages.

NLT also takes the position that the evidence was insufficient to entitle Green to punitive damages.[1] If the evidence supports a finding of either actual or legal malice, then the issue of punitive damages is submissible. *Labrier,* 621 S.W.2d at 58[13]. The evidence described above supports a finding that the letter did not state the true cause of termination. Therefore, the letter constituted a wrongful act intentionally committed without just cause or excuse, and it supports a finding of legal malice. *Labrier,* 621 S.W.2d at 58[14].

Green contends that the trial court abused its discretion in awarding a new trial in the event the judgment N.O.V. was reversed. Under Rule 78.02, the trial court is limited to granting one new trial on the ground that the verdict is against the weight of the evidence. In *Kreutz v. Wolff,* 560 S.W.2d 271, 279[16] (Mo.App. 1977), the court stated that the granting of a new trial because the verdict is against the weight of the evidence is presumptively correct, and appellate courts are liberal in sustaining such an order. Thus, this court cannot say that the trial court abused its discretion in awarding a new trial on the ground that the verdict was against the weight of the evidence.

Green finally contends that because the letter admittedly stated the duration of her employment inaccurately, she is entitled to a directed verdict for at least nominal damages. While NLT admitted that dates stated in the letter were incorrect, it is nevertheless proper to remand a case for trial on all issues when the issues of liability and damages are interrelated or when there is an issue of punitive damages. *Demmas v. St. Louis Outdoor Advertising, Inc.,* 452 S.W.2d 303, 308[8] (Mo.App.1970). Remand for trial on all issues is proper in this case, since the issues of liability and damages are

---

1. Section 290.140 was amended in 1982 to prohibit employees from recovering punitive damages in service letter cases. This case, however, falls under the prior version of § 290.140, which allows punitive damages.

interrelated, and the issue of punitive damages is present.

In summary, the evidence presented was sufficient to support a finding that the letter did not correctly state the nature and character of the service rendered by Green, the duration of that service, and the true cause of her termination. The judgment N.O.V. is reversed, and this cause is remanded for a new trial on all issues on the trial court's order granting a new trial.

All concur.

